**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Petitioner*, | |
| v. | NO. 1:20-MC-00116 |
| CHINA TELECOM (AMERICAS) CORPORATION, | |
| *Respondent.* | |

**UNCLASSIFIED MEMORANDUM IN SUPPORT OF THE
UNITED STATES' PETITION FOR A DETERMINATION
THAT FISA SURVEILLANCE OF CHINA TELECOM (AMERICAS)
<u>CORPORATION WAS LAWFULLY AUTHORIZED AND CONDUCTED</u>**

TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................... 1

FACTUAL BACKGROUND…....…………………………………………...…...……...2

FISA BACKGROUND AND DISTRICT COURT REVIEW...................................................... 5

I. THE FISA PROCESS ........................................................................................................... 5

    A. OVERVIEW OF FISA ................................................................................................ 6

    B. THE FISA APPLICATION ........................................................................................ 6

        1. The Certification................................................................................................... 8

        2. Minimization Procedures ..................................................................................... 8

        3. Attorney General's Approval .............................................................................. 9

    C. THE FISC'S ORDERS................................................................................................ 9

II. THE DISTRICT COURT'S REVIEW OF FISC ORDERS ................................................ 12

    A. THE DISTRICT COURT'S *IN CAMERA, EX PARTE* REVIEW ........................... 14

        1. The Consistent Use of *In Camera, Ex Parte* Review ..................................... 15

        2. The Constitutionality of *In Camera, Ex Parte* Review.................................... 18

    B. THE DISTRICT COURT'S SUBSTANTIVE REVIEW ........................................... 19

        1. Standard of Review of Probable Cause............................................................. 19

        2. Probable Cause Standard .................................................................................. 20

        3. Standard of Review of Certifications ................................................................ 22

        4. The Good Faith Exception ................................................................................ 24

DISCUSSION…………………………………………………..……………………………25

I. **[CLASSIFIED MATERIAL REDACTED]** ..................................................................... 25

    A. THE FISA APPLICATIONS MET FISA'S PROBABLE CAUSE STANDARD................... 25

        1. **[CLASSIFIED MATERIAL REDACTED]** ................................................. 25

            a. **[CLASSIFIED MATERIAL REDACTED]** ........................................ 25

            b. **[CLASSIFIED MATERIAL REDACTED]** ........................................ 25

                i. **[CLASSIFIED MATERIAL REDACTED]** ................................ 25

                ii. **[CLASSIFIED MATERIAL REDACTED]** ................................ 25

        2. **[CLASSIFIED MATERIAL REDACTED]** ................................................. 25

        3. **[CLASSIFIED MATERIAL REDACTED]** ................................................. 25

        4. **[CLASSIFIED MATERIAL REDACTED]** ................................................. 26

    B. THE CERTIFICATIONS COMPLIED WITH FISA .................................................. 26

        1. The Requisite Official Certified that the Information Sought Was Foreign
           Intelligence Information ................................................................................... 26

2.  The Requisite Official Certified that "A Significant Purpose" of the Surveillance Was to Obtain Foreign Intelligence Information................................................... 26

3.  The Requisite Official Certified that the Information Could Not Reasonably Have Been Obtained Through Normal Investigative Techniques ..................... 26

C.  THE ELECTRONIC SURVEILLANCE WAS LAWFULLY CONDUCTED ..................... 26

1.  The Government Complied with the Standard Minimization Procedures .......... 26

2.  The FISA Information Was Appropriately Minimized ........................................... 30

II.  THE FISA SURVEILLANCE AT ISSUE WAS CONDUCTED IN GOOD FAITH. ................ 30

III.  THERE IS NO BASIS FOR THE COURT TO DISCLOSE FISA MATERIALS ..................... 31

CONCLUSION ................................................................................................................................. 32

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*ACLU Found. of So. Cal. v. Barr,*
  952 F.2d 457 (D.C. Cir. 1991) .................................................................................................. 18

*CIA v. Sims,*
  471 U.S. 159 (1985)................................................................................................................... 17

*Davis v. United States,*
  564 U.S. 229 (2011)................................................................................................................... 25

*Global Relief Found. Inc. v. O'Neill,*
  207 F. Supp. 2d 779 (N.D. Ill. June 11, 2002),
  315 F.3d 748 (7th Cir. 2002) .................................................................................................... 11

*Halperin v. CIA,*
  629 F.2d 144 (D.C. Cir. 1980) .................................................................................................. 18

*In re Grand Jury Proceedings of the Special Apr. 2002 Grand Jury,*
  347 F.3d 197 (7th Cir. 2003)............................................................................................... 16, 23

*In re Kevork,*
  634 F. Supp. 1002 (C.D. 1985) ................................................................................................. 27

*In re Sealed Case,*
  310 F.3d 717 (FISA Ct. Rev. 2002) .................................................................................... 22, 27

*Phillippi v. CIA,*
  655 F.2d 1325 (D.C. Cir. 1981) ................................................................................................ 17

*Scott v. United States,*
  436 U.S. 128 (1978).................................................................................................................... 29

*United States v. Abu-Jihaad,*
  531 F. Supp. 2d 299 (D. Conn. Jan. 24, 2008),
  630 F.3d 102 (2d Cir. 2010) ................................................................................................. passim

*United States v. Ahmed,*
  No. 1:06-CR-147, 2009 U.S. Dist. Lexis 120007 (N.D. Ga. Mar. 19, 2009) ..................... 20, 23

*United States v. Alwan,*
  No. 1:11-CR-13, 2012 WL 399154 (W.D. Ky. Feb. 7, 2012) .................................................. 23

*United States v. Badia,*
  827 F.2d 1458 (11th Cir. 1987) ............................................................................. 16, 22, 23, 32

*United States v. Belfield,*
    692 F.2d 141 (D.C. Cir. 1982) ................................................................................ *passim*

*United States v. Benkahla,*
    437 F. Supp. 2d 541 (E.D. Va. May 17, 2006) ................................................. 19

*United States v. Bin Laden,*
    126 F. Supp. 2d 264 (S.D.N.Y. 2000) .............................................. 25, 27, 28

*United States v. Campa,*
    529 F.3d 980 (11th Cir. 2008) ...................................................................... 22, 23

*United States v. Cavanagh,*
    807 F.2d 787 (9th Cir. 1987) ........................................................................ 21, 22

*United States v. Damrah,*
    412 F.3d 618 (6th Cir. 2005) ........................................................................ 18, 22

*United States v. Daoud,*
    755 F.3d 479 (7th Cir. 2014),
    No. 12-CR-723, 2014 WL 321384 (N.D. Ill. Jan. 29, 2014) ........... 14, 15, 16, 18

*United States v. Duggan,*
    743 F.2d 59 (2d Cir. 1984) ...................................................................... *passim*

*United States v. Duka,*
    671 F.3d 329 (3d Cir. 2011) ............................................................ 21, 24, 25

*United States v. El-Mezain,*
    664 F.3d 467 (5th Cir. 2011) ...................................................... 15, 16, 19, 21

*United States v. Falcone,*
    364 F. Supp. 877 (D.N.J. Sept. 28, 1973),
    500 F.2d 1401 (3d Cir. 1974) ........................................................................ 30

*United States v. Falvey,*
    540 F. Supp. 1306 (E.D.N.Y. June 15, 1982) ............................................ 19, 22

*United States v. Garcia,*
    413 F.3d 201 (2d Cir. 2005) ........................................................................ 24

*United States v. Hamide,*
    914 F.2d 1147 (9th Cir. 1990) .................................................................... 15

*United States v. Hammoud,*
    381 F.3d 316, 332 (4th Cir. 2004) ........................................................ 20, 27, 29

*United States v. Hasan,*
    No. W-12MC195, 2012 WL 12883086 (W.D. Tex. Aug. 14, 2012),
    535 F. App'x 378 (5th Cir. 2013) ............................................................ 24

*United States v. Hasbajrami*,
No. 11-CR-623 (JG), 2016 WL 1029500 (E.D.N.Y. Feb. 18, 2016) .................................... 31

*United States v. Isa*,
923 F.2d 1300 (8th Cir. 1991) ................................................................................. *passim*

*United States v. Islamic Am. Relief Agency*,
No. 07-00087-CR-W-NKL, 2009 WL 5169536 (W.D. Mo. Dec. 21, 2009) ......................... 17, 24, 29

*United States v. Kashmiri*,
No. 09-CR-830, 2010 WL 4705159 (N.D. Ill. Nov. 10, 2010) ...................................... 20, 23

*United States v. Leon*,
468 U.S. 897 (1984) ......................................................................................... 24, 25

*United States v. Marzook*,
435 F. Supp. 2d 778 (N.D. Ill. June 22, 2006) ...................................................... 22, 24

*United States v. Megahey*,
553 F. Supp. 1180 (E.D.N.Y. Dec. 1, 1982) ............................................................... 19

*United States v. Mubayyid*,
521 F. Supp. 2d 125 (D. Mass. Nov. 5, 2007) ...................................... 22, 24, 28, 29, 32

*United States v. Ning Wen*,
477 F.3d 896 (7th Cir. 2007) ............................................................................ 22, 24

*United States v. Omar*,
No. 09-242, 2012 WL 2357734 (D. Minn. June 20, 2012),
786 F.3d 1104 (8th Cir. 2015) ........................................................ 15, 16, 19, 20, 23

*United States v. Ott*,
827 F.2d 473 (9th Cir. 1987) ......................................................................... 15, 16, 18

*United States v. Pelton*,
835 F.2d 1067 (4th Cir. 1987) .............................................................................. 22

*United States v. Rahman*,
861 F. Supp. 247 (S.D.N.Y. Aug. 18, 1994),
189 F.3d 88 (2d Cir. 1999) .......................................................................... 23, 27, 28

*United States v. Rosen*,
447 F. Supp. 2d 538 (E.D. Va. Aug. 14, 2006) ................................................... *passim*

*United States v. Salameh*,
152 F.3d 88, 154 (2d Cir. 1998) .......................................................................... 27

*United States v. Sattar*,
No. 02-CR-395, 2003 WL 22137012 (S.D.N.Y. Sept. 15, 2003) .................................... 16

*United States v. Squillacote*,
  221 F.3d 542 (4th Cir. 2000) .......................................................................................... 11

*United States v. Stewart*,
  590 F.3d 93 (2d Cir. 2009) ........................................................................................ 16, 18

*United States v. Thomson*,
  752 F. Supp. 75 (W.D.N.Y. Oct. 24, 1990) ........................................................ 16, 27, 28

*United States v. Turner*,
  840 F.3d 336 (2016) .............................................................................................. 20, 22, 23

*United States v. U.S. Gypsum Co.*,
  333 U.S. 364 (1948) ...................................................................................................... 24

*United States v. United States District Court*,
  407 U.S. 297 (1972) ...................................................................................................... 21

*United States v. Warsame*,
  547 F. Supp. 2d 982 (D. Minn 2008) .................................................................. 20, 22, 23

*United States v. Yunis*,
  867 F.2d 617 (D.C. Cir. 1989) .......................................................................................... 7

## Constitution

Amend I ........................................................................................................................ 11

Amend IV .................................................................................................................. 29, 29

## Statutes

Foreign Intelligence Surveillance Act, 50 U.S.C. §§ 1801 *et seq.* ............................................ 1

50 U.S.C. § 1801 ...................................................................................................... *passim*

50 U.S.C. § 1802 .............................................................................................................. 7

50 U.S.C. § 1803 .............................................................................................................. 6

50 U.S.C. § 1804 ............................................................................................... 6, 7, 8, 9

50 U.S.C. § 1805 .............................................................................................. 9, 11, 12, 20

50 U.S.C. § 1806 ...................................................................................................... *passim*

50 U.S.C. § 1821 ........................................................................................... 7, 9, 10, 11, 29

50 U.S.C. § 1823 ............................................................................................... 6, 8, 9

50 U.S.C. § 1824 .............................................................................................. 9, 11, 12, 20

Communications Act,

47 U.S.C. § 214(a), .......................................................................................................... 2, 3, 4

47 U.S.C. § 310(b) ................................................................................................................ 2

Uniting and Strengthening America by Providing Appropriate Tools Required to
    Intercept and Obstruct Terrorism Act, Pub. L No. 107-56, 115 Stat. 272 (2001) ............................ 6

**Other Authorities**

Executive Order 12333 ......................................................................................................... 24

H.R. Rep. No. 95-1283, 95th Cong., 2d Sess., Pt 1 (1978)...................................... 27, 28, 29, 30

S. Rep. No. 95-701, 95th Cong., 2d Sess. (1978), *reprinted in* 1978 U.S.C.C.A.N. 3973,
    3980, 4008 ..................................................................................................................... 22, 29

## INTRODUCTION

In April 2020, law enforcement and national security agencies within the Executive Branch recommended that the Federal Communications Commission ("FCC") revoke China Telecom Americas Corporation's ("CTAC") license to provide certain telecommunications services in the United States because CTAC violated the terms of its existing license and because its provision of such telecommunications services in the United States poses a threat to U.S. national security.  In support of that recommendation, the Executive Branch, acting through the Department of Justice ("DoJ"), notified CTAC that it intends to use information obtained or derived from electronic surveillance under the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. §§ 1801 *et seq.* (hereinafter "FISA information") in the FCC proceeding against CTAC.[1]  In response, CTAC requested access to the FISA information, as well as any other FISA materials, in the FCC's possession.[2]

The Attorney General of the United States has determined that disclosure of the information and materials requested by CTAC, or an adversary hearing with respect to them, would harm the national security of the United States.  *See* Declaration of the Attorney General of the United States Pursuant to 50 U.S.C. § 1806(f), attached hereto as Exhibit 1 (hereinafter "Attorney General's Declaration").[3]  As explained in the United States' Petition to Initiate a Determination that Certain FISA Surveillance was Lawfully Authorized and Conducted, ECF No. 1 (hereinafter "Government's Petition"), CTAC's requests, along with the Attorney General's Declaration, have triggered this Court's jurisdiction

---

[1] The FISA provisions that address electronic surveillance are found at 50 U.S.C. §§ 1801-1812.

[2] **[CLASSIFIED MATERIAL REDACTED]**

[3] The Attorney General's Declaration is unclassified and is filed both publicly and as part of the Government's classified filing so that the Court has a complete package to review under seal.  *See* Sealed Ex. 1.

to review *in camera* and *ex parte* the materials related to the FISA-authorized electronic surveillance of CTAC to determine whether it "was lawfully authorized and conducted." 50 U.S.C. § 1806(f).[4]

As the Court's *in camera* review of the Government's *ex parte* submissions will show, the electronic surveillance at issue was lawfully authorized and conducted in compliance with FISA. Namely, (1) the FISA application(s) contained the required statements and certifications; (2) there was probable cause to determine that (a) the target(s) of the FISA-authorized electronic surveillance were foreign powers or agents of foreign powers, and (b) the targeted facility or facilities were being used, or were about to be used, by those target(s); and (3) the Government complied with the applicable minimization procedures. The Court should therefore deny CTAC's requests to the FCC to obtain the FISA information and materials at issue, *see id.* § 1806(g) (providing that if the district court "determines that the surveillance was lawfully authorized and conducted, it shall deny the motion of the aggrieved person except to the extent due process requires discovery or disclosure"), and it should do so without an adversary hearing, *see id.* § 1806(f) (providing for the disclosure of FISA materials to an aggrieved person only where "necessary to make an accurate determination of the legality of [FISA-authorized electronic] surveillance").[5]

## FACTUAL BACKGROUND

The underlying proceeding—where the Government has informed CTAC that it intends to use FISA information against it—is before the FCC. The FCC is an independent federal agency headquartered in Washington, D.C., responsible for authorizing companies to provide interstate and international communication services by radio, television, wire, satellite, and cable. In determining whether to grant an application for a license to provide certain communications services, the FCC considers whether doing so would serve "the public interest, convenience, and necessity." *See* 47 U.S.C. §§ 214(a), 310(b).

---

[4] **[CLASSIFIED MATERIAL REDACTED]**

[5] **[CLASSIFIED MATERIAL REDACTED]**

As part of this public interest analysis, the FCC has long considered the Executive Branch's view on national security, law enforcement, foreign policy, and trade concerns that may arise from foreign ownership in an applicant and that weigh in favor of or against granting an application.

Since 2001, the FCC has licensed CTAC to provide international telecommunications services in the United States pursuant to Section 214 of the Communications Act, as amended, 47 U.S.C. § 214(a), 47 C.F.R. § 63.18 (hereinafter "Section 214"). CTAC is a Delaware corporation that is indirectly owned and controlled by the People's Republic of China ("PRC"). That line of ownership and control proceeds as follows: The State-owned Assets Supervision and Administration Commission of the PRC State Council, a PRC organization, is the direct 100% sole owner of China Telecom Group ("China Telecom"). China Telecom, in turn, is a corporation organized under Chinese law and holds a 70.89% voting and equity interest in China Telecom Corporation Limited ("CTCL"). Finally, CTAC is a direct, wholly owned subsidiary of CTCL, which is incorporated in China.

In 2007, CTAC underwent corporate reorganization, which required it to seek a grant of authority from the FCC to transfer control of its Section 214 license to the reorganized corporate entity. As a result, the Executive Branch conducted a public interest review of CTAC's request for transfer of control. Pursuant to that review, the Executive Branch executed a Letter of Agreement ("LOA"), dated July 17, 2007, with CTAC as a condition of recommending that the FCC approve the request for transfer of control. On August 9, 2007, the Executive Branch, acting through the Department of Homeland Security ("DHS"), petitioned the FCC to impose on CTAC the conditions contained in the LOA as part of the FCC's grant of the request for transfer of control of the Section 214 license. On August 15, 2007, the FCC granted CTAC's request for transfer of control, but made clear that it "condition[s] grant of this ... transfer of control on [CTAC's] abiding by the commitments and undertakings contained in the July 17, 2007 [LOA]." The 2007 LOA is a three-page document with five key provisions, including commitments by CTAC:

(1)   To make U.S. records available in the United States in response to lawful U.S. process;

(2)   To take all practicable measures to prevent unauthorized access to U.S. records;

(3)   Not to disclose or permit access to U.S. records or U.S. law enforcement demands in response to a foreign government request, and to notify U.S. authorities promptly if it received foreign government requests;

(4)   To maintain a U.S. point of contact for accepting and overseeing compliance with U.S. law enforcement demands made pursuant to lawful process; and

(5)   To notify the Federal Bureau of Investigation ("FBI"), DoJ, and DHS of material changes to CTAC's services or of any action requiring notice or an application to the FCC.

In the LOA, CTAC also agreed that if it breached any of these commitments, the Executive Branch could recommend that the FCC revoke any license or authorization granted to CTAC by the FCC, including the Section 214 license that was the subject of the request for transfer of control.

**[CLASSIFIED MATERIAL REDACTED]**

On April 9, 2020, the Executive Branch recommended that the FCC revoke and terminate CTAC's 214 license. *In the Matter of China Telecom (Americas) Corp.*, FCC File Nos. ITC-214-20010613-00346; ITC-214-20020716-00371; ITC-T/C-20070725-00285, "Executive Branch Recommendation to the [FCC] to Revoke and Terminate [CTAC's] International Section 214 Common Carrier Authorizations" (filed Apr. 9, 2020) (hereinafter "the Recommendation").[6]

**[CLASSIFIED MATERIAL REDACTED]**

Also on April 9, 2020, DoJ provided notice to the FCC and CTAC that it "intends to offer into evidence or otherwise use or disclose" FISA information in the FCC proceeding, namely in the classified appendix in support of its Recommendation to the FCC to revoke and terminate CTAC's Section 214 authorizations. "Notice by [DoJ] of Intent to Use [FISA] Information" (filed Apr. 9, 2020); *see also* 50 U.S.C. § 1806(c).  On May 1, 2020, and June 3, 2020, CTAC filed letters with the FCC, requesting the

---

[6] The entirety of the relevant FCC docket is available at http://licensing.fcc.gov/cgi-bin/ws.exe/prod/ib/forms/reports/related_filing.hts?f_key=-133273&f_number=ITCT/C20070725 00285.  Hereinafter, further citation to the FCC docket and file numbers is omitted unless otherwise indicated.

FISA information and related materials. "China Telecom Request for FISA Information" (filed May 1, 2020); "CTA[C] Response to DoJ Letter Re FISA Materials" (filed June 3, 2020) (hereinafter, and collectively, "the requests").

As set forth in the Attorney General's Declaration, he has determined that disclosure or an adversary hearing with respect to the FISA material requested by CTAC would harm the national security of the United States. *See* Sealed Ex. 1; 50 U.S.C. § 1806(f). Accordingly, pursuant to § 1806(f), this Court "shall ... review *in camera* and *ex parte* the application, order, and such other materials as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted." 50 U.S.C. § 1806(f); *see generally* Government's Petition.

**[CLASSIFIED MATERIAL REDACTED]**

**FISA BACKGROUND AND DISTRICT COURT REVIEW**

**I. THE FISA PROCESS**

To aid the Court's review, this memorandum provides a general overview of the FISA process.[7] Specifically, it explains the process for applying for a FISA order to conduct FISA surveillance, the requisite findings the FISC must make in order to issue such a FISA order, and the procedures and standards that govern a district court's review of the legality of FISA surveillance under § 1806(f). To be clear, not all aspects of the FISA process addressed in the overview are at issue in this matter, and this memorandum generally notes where the Court does not need to address an issue in assessing the legality of the electronic surveillance that is the subject of this § 1806(f) proceeding. The overview nevertheless discusses these additional issues to provide further context for the Court's review of the FISA surveillance at issue.

---

[7] As a result of the redactions, the pagination and footnote numbering of the classified memorandum and the unclassified memorandum are different.

## A. OVERVIEW OF FISA[8]

Enacted in 1978, and subsequently amended, FISA authorizes the Chief Justice of the United States to designate eleven United States District Judges to sit as judges of the FISC. 50 U.S.C. § 1803(a)(1). The FISC judges are empowered to consider *ex parte* applications submitted by the Executive Branch for electronic surveillance and physical search when a significant purpose of the application is to obtain foreign intelligence information, as defined in FISA. Rulings of the FISC are subject to review by the Foreign Intelligence Surveillance Court of Review ("FISC of Review"), which is composed of three United States District or Circuit Judges who are designated by the Chief Justice. *Id.* § 1803(b).

As originally enacted, FISA required that a high-ranking member of the Executive Branch certify that "the purpose" of the FISA application was to obtain foreign intelligence information. In 2001, FISA was amended as part of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act ("USA PATRIOT Act").[9] One change to FISA accomplished by the USA PATRIOT Act is that a high-ranking official is now required to certify that the acquisition of foreign intelligence information is "a significant purpose" of the requested surveillance. *Id.* § 1804(a)(6)(B).

## B. THE FISA APPLICATION

FISA provides a statutory procedure whereby the Executive Branch may obtain a judicial order authorizing the use of electronic surveillance, physical search, or both, within the United States where a significant purpose is the collection of foreign intelligence information.[10] 50 U.S.C. §§ 1804(a)(6)(B), 1823(a)(6)(B). Under FISA, "[f]oreign intelligence information" means:

(1) information that relates to, and if concerning a United States person[11] is necessary to, the ability of the United States to protect against—

---

[8] This memorandum references the statutory language in effect at the time relevant to this matter.

[9] Pub. L. No. 107-56, 115 Stat. 272 (2001).

[10] **[CLASSIFIED MATERIAL REDACTED]**

[11] **[CLASSIFIED MATERIAL REDACTED]**

(A) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power;

(B) sabotage, international terrorism, or the international proliferation of weapons of mass destruction by a foreign power or an agent of a foreign power; or

(C) clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power; or

(2) information with respect to a foreign power or foreign territory that relates to, and if concerning a United States person is necessary to—

(A) the national defense or the security of the United States; or

(B) the conduct of the foreign affairs of the United States.

*Id.* § 1801(e); *see also id.* § 1821(1) (adopting the definitions from § 1801). With the exception of emergency authorizations, FISA requires that a court order be obtained before any electronic surveillance or physical search may be conducted. *See id.* §§ 1802, 1804.

An application to conduct electronic surveillance pursuant to FISA must contain, among other things:

(1) the identity of the federal officer making the application;

(2) the identity, if known, or a description of the specific target of the electronic surveillance;

(3) a statement of the facts and circumstances supporting probable cause to believe that the target is a foreign power or an agent of a foreign power, and that each facility or place at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power;

(4) a statement of the proposed minimization procedures to be followed;

(5) a detailed description of the nature of the information sought and the type of communications or activities to be subjected to the surveillance;

(6) a certification, discussed below, of a high-ranking official;

(7) a summary of the manner or means by which the electronic surveillance will be effected and a statement whether physical entry is required to effect the electronic surveillance;

(8) the facts concerning and the action taken on all previous FISA applications involving any of the persons, facilities, or places specified in the application; and

(9) the proposed duration of the electronic surveillance.

*Id.* § 1804(a)(1)-(9).

An application to conduct a physical search pursuant to FISA must contain similar information as an application to conduct electronic surveillance except that an application to conduct a physical search must also contain a statement of the facts and circumstances that justify an applicant's belief that "the premises or property to be searched contains foreign intelligence information" and that each "premises or property to be searched is or is about to be, owned, used, possessed by, or is in transit to or from" the target. *Id.* §§ 1823(a)(1)-(8), (a)(3)(B), (C).[12]

### 1. The Certification

An application to the FISC for a FISA order must include a certification from a high-ranking Executive Branch official with national security responsibilities that:

(A) the certifying official deems the information sought to be foreign intelligence information;

(B) a significant purpose of the surveillance is to obtain foreign intelligence information;

(C) such information cannot reasonably be obtained by normal investigative techniques;

(D) designates the type of foreign intelligence information being sought according to the categories described in [50 U.S.C. §] 1801(e); and

(E) includes a statement of the basis for the certification that—

(i) the information sought is the type of foreign intelligence information designated; and

(ii) such information cannot reasonably be obtained by normal investigative techniques.

50 U.S.C. § 1804(a)(6); *see also id.* § 1823(a)(6).

### 2. Minimization Procedures

The Attorney General has adopted, and the FISC has approved, minimization procedures that regulate the acquisition, retention, and dissemination of non-publicly available information concerning unconsenting United States persons obtained through FISA-authorized electronic surveillance or physical search, including persons who are not the targets of the FISA authorities. FISA requires that such minimization procedures be:

> reasonably designed in light of the purpose and technique of the particular surveillance, to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information.

---

[12] **[CLASSIFIED MATERIAL REDACTED]**

*Id.* §§ 1801(h)(1), 1821(4)(A).

In addition, minimization procedures also include "procedures that allow for the retention and dissemination of information that is evidence of a crime which has been, is being, or is about to be committed and that is to be retained or disseminated for law enforcement purposes." *Id.* §§ 1801(h)(3), 1821(4)(c).

### [CLASSIFIED MATERIAL REDACTED]

### 3. Attorney General's Approval

FISA further requires that the Attorney General approve applications for electronic surveillance, physical search, or both, before they are presented to the FISC. *See id.* § 1804.

### C. THE FISC'S ORDERS

Once approved by the Attorney General, the application is submitted to the FISC and assigned to one of its judges. The FISC may approve the requested electronic surveillance, physical search, or both, only upon finding, among other things, that:

> (1) the application has been made by a "Federal officer" and has been approved by the Attorney General;
>
> (2) there is probable cause to believe that (A) the target of the electronic surveillance and/or physical search is a foreign power or an agent of a foreign power, and that (B) the facilities or places at which the electronic surveillance is directed are being used, or are about to be used, by a foreign power or an agent of a foreign power (or that the premises or property to be searched is, or is about to be, owned, used, possessed by, or is in transit to or from, a foreign power or an agent of a foreign power);
>
> (3) the proposed minimization procedures meet the statutory requirements set forth in 50 U.S.C. § 1801(h) (electronic surveillance) and 50 U.S.C. § 1821(4) (physical search);
>
> (4) the application contains all of the statements and certifications required by Section 1804 or Section 1823; and
>
> (5) if the target is a United States person, that the certifications are not clearly erroneous.

50 U.S.C. §§ 1805(a)(1)-(4), 1824(a)(1)-(4).

FISA defines "foreign power" to mean—

> (1) a foreign government or any component, thereof, whether or not recognized by the United States;

(2) a faction of a foreign nation or nations, not substantially composed of United States persons;

(3) an entity that is openly acknowledged by a foreign government or governments to be directed and controlled by such foreign government or governments;

(4) a group engaged in international terrorism or activities in preparation therefor;

(5) a foreign-based political organization, not substantially composed of United States persons;

(6) an entity that is directed and controlled by a foreign government or governments; or

(7) an entity not substantially composed of United States persons that is engaged in the international proliferation of weapons of mass destruction.

*Id.* § 1801(a)(1)-(7); *see also id.* § 1821(1) (adopting definitions from § 1801).

FISA defines "[a]gent of a foreign power" to mean—

(1) any person other than a United States person, who—

(A) acts in the United States as an officer or employee of a foreign power, or as a member of a foreign power as defined in subsection (a)(4);

(B) acts for or on behalf of a foreign power which engages in clandestine intelligence activities in the United States contrary to the interests of the United States, when the circumstances of such person's presence in the United States indicate that such person may engage in such activities in the United States, or when such person knowingly aids or abets any person in the conduct of such activities or knowingly conspires with any person to engage in such activities;

(C) engages in international terrorism or activities in preparation therefore [sic];

(D) engages in the international proliferation of weapons of mass destruction, or activities in preparation therefor; or

(E) engages in the international proliferation of weapons of mass destruction, or activities in preparation therefor for or on behalf of a foreign power; or

(2) any person who—

(A) knowingly engages in clandestine intelligence gathering activities for or on behalf of a foreign power, which activities involve or may involve a violation of the criminal statutes of the United States;

(B) pursuant to the direction of an intelligence service or network of a foreign power, knowingly engages in any other clandestine intelligence activities for or on behalf of such foreign power, which activities involve or are about to involve a violation of the criminal statutes of the United States;

(C) knowingly engages in sabotage or international terrorism, or activities that are in preparation therefor, for or on behalf of a foreign power;

(D) knowingly enters the United States under a false or fraudulent identity for or on behalf of a foreign power or, while in the United States, knowingly assumes a false or fraudulent identity for or on behalf of a foreign power; or

(E) knowingly aids or abets any person in the conduct of activities described in [the subparagraphs above] ... or knowingly conspires with any person to engage in activities described in [the subparagraphs above.]

*Id.* §§ 1801(b)(1) and (2); *see also id.* § 1821(1) (adopting definitions from § 1801).[13]

The FISA application must establish probable cause to believe the target was a foreign power or an agent of a foreign power at the time of the application. *See United States v. Squillacote*, 221 F.3d 542, 554 (4th Cir. 2000) (concluding that the FISA applications established "probable cause to believe that ... [the targets] were agents of a foreign power at the time the applications were granted"); *United States v. Abu-Jihaad*, 531 F. Supp. 2d 299, 310 (D. Conn. Jan. 24, 2008) (finding that the FISA collection was lawfully collected and finding specifically, *inter alia*, that "[e]ach application contained facts establishing probable cause to believe that, at the time the application was submitted to the FISC, the target of the FISA collection was an agent of a foreign power...."), *aff'd*, 630 F.3d 102 (2d Cir. 2010); *Global Relief Found. Inc. v. O'Neill*, 207 F. Supp. 2d 779, 790 (N.D. Ill. June 11, 2002) (concluding that "the FISA application established probable cause ... at the time the search was conducted and the application was granted"), *aff'd*, 315 F.3d 748 (7th Cir. 2002). Additionally, FISA provides that "[i]n determining whether or not probable cause exists ... a judge may consider past activities of the target, as well as facts and circumstances relating to current or future activities of the target." 50 U.S.C. §§ 1805(b), 1824(b).

If the FISC has made all of the necessary findings and is satisfied that the FISA application meets the statutory provisions, the FISC issues an *ex parte* order authorizing the electronic surveillance, physical search, or both, requested in the application. *Id.* §§ 1805(a), 1824(a). The order must specify:

(1) the identity, if known, or a description of the specific target of the collection;

(2) the nature and location of each facility or place at which the electronic surveillance will be directed or of each of the premises or properties that will be searched;

---

[13] **[CLASSIFIED MATERIAL REDACTED]**

11

(3) the type of information sought to be acquired and the type of communications or activities that are to be subjected to the electronic surveillance, or the type of information, material, or property that is to be seized, altered, or reproduced through the physical search;

(4) the manner and means by which electronic surveillance will be effected and whether physical entry will be necessary to effect that surveillance, or a statement of the manner in which the physical search will be conducted;

(5) the period of time during which electronic surveillance is approved and/or the authorized scope of each physical search; and

(6) the applicable minimization procedures.

*Id.* §§ 1805(c)(1) and 2(A), 1824(c)(1) and 2(A).

Under FISA, electronic surveillance or physical search targeting a United States person may be approved for up to ninety days, and those targeting a non-United States person may be approved for up to 120 days. *Id.* §§ 1805(d)(1), 1824(d)(1). Extensions may be granted, but only if the United States submits another application that complies with FISA's requirements. An extension for electronic surveillance or physical search targeting a United States person may be approved for up to ninety days, and one targeting a non-United States person may be approved for up to one year. *Id.* §§ 1805(d)(2), 1824(d)(2).[14]

## II. THE DISTRICT COURT'S REVIEW OF FISC ORDERS

To use information obtained or derived from any FISA-authorized electronic surveillance or physical search in a proceeding against an aggrieved person, the Government must obtain the Attorney General's advance authorization, 50 U.S.C. § 1806(b), and must notify the aggrieved person against whom, and the court or authority in which, the information is to be used. *Id.* § 1806(c)-(d).[15] Upon

---

[14] The FISC retains the authority to review, before the end of the authorized period of electronic surveillance or physical search, the Government's compliance with the requisite minimization procedures. *See* 50 U.S.C. §§ 1805(d)(3), 1824(d)(3).

[15] An "aggrieved person" is defined as the target of electronic surveillance or "any other person whose communications or activities were subject to electronic surveillance." 50 U.S.C. § 1801(k). CTAC is an "aggrieved person" under FISA, and as noted above, was provided with notice of the Government's intent to use FISA-obtained or -derived information against it in the administrative proceedings before the FCC.

receiving such notice, the aggrieved person against whom the information is to be used may move to suppress the FISA evidence on the grounds that: (1) the information was unlawfully acquired; or (2) the electronic surveillance was not conducted in conformity with an order of authorization or approval. *Id.* § 1806(e).

To resolve such motions, and other related motions or requests to discover or obtain FISA materials or information under this section, while protecting FISA materials and information from disclosure, Congress authorized district courts to conduct an *in camera* review of the Government's *ex parte* submissions to determine "whether the surveillance of the aggrieved person was lawfully authorized and conducted." *Id.* § 1806(f). Section 1806(f) provides in pertinent part:

> [W]henever a court or other authority is notified pursuant to subsection (c) or (d), or whenever a motion is made pursuant to subsection (e), or whenever any motion or request is made by an aggrieved person pursuant to any other statute or rule of the United States or any State before any court or other authority of the United States or any State to discover or obtain applications or orders or other materials relating to electronic surveillance or to discover, obtain or suppress evidence or information obtained or derived from electronic surveillance under this Act, the United States district court or, where the motion is made before another authority, the United States district court in the same district as the authority, shall, notwithstanding any other law, if the Attorney General files an affidavit under oath that disclosure or an adversary hearing would harm the national security of the United States, review *in camera* and *ex parte* the application, order, and such other materials relating to the surveillance as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted. In making this determination, the court may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other materials related to the surveillance only where such disclosure is necessary to make an accurate determination of the legality of the surveillance.

*Id.* Thus, the Court's review pursuant to § 1806(f) may occur in three related situations: (1) whenever a court or other authority receives FISA notice from the Government that it intends to use FISA information against an aggrieved person; (2) whenever an aggrieved person moves to suppress the use of that information; or (3) whenever an aggrieved person files a motion or other request to discover or obtain FISA materials or information under this section. *Id.* In any of those situations, "if the Attorney General files an affidavit under oath that disclosure or an adversary hearing would harm the national security of

the United States," the district court shall conduct an *ex parte*, *in camera* review to determine the legality of the FISA surveillance at issue. *Id.*

## A. THE DISTRICT COURT'S *IN CAMERA, EX PARTE* REVIEW

In assessing the legality of FISA-authorized electronic surveillance, the district court "shall, notwithstanding any other law, if the Attorney General files an affidavit under oath that disclosure or an adversary hearing would harm the national security of the United States, review *in camera* and *ex parte* the application, order, and such other materials relating to the surveillance as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted." 50 U.S.C. § 1806(f).[16] On the filing of the Attorney General's affidavit or declaration, such as that filed here, the court "may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the surveillance *only* where such disclosure is *necessary* to make an accurate determination of the legality of the surveillance." *Id.* (emphasis added). Thus, the propriety of the disclosure of any FISA applications or orders to an aggrieved person may not even be considered unless and until the district court has first concluded that it is unable to make an accurate determination of the legality of the acquired collection after reviewing *in camera* the Government's *ex parte* submissions (and any supplemental pleadings that the district court may request). *See United States v. Belfield*, 692 F.2d 141, 147 (D.C. Cir. 1982) ("Disclosure and an adversary hearing are the exception, occurring *only* when necessary."); *Abu-Jihaad*, 630 F.3d at 129; *United States v. Duggan*, 743 F.2d 59, 78 (2d Cir. 1984) (After an *in camera* review, the court "has the discretion to disclose portions of the documents, under appropriate protective procedures, only if [the judge] decides that such disclosure is 'necessary to make an accurate determination of the legality of the surveillance.'") (quoting 50 U.S.C. §1806(f)); *United States v. Daoud*, 755 F.3d 479, 484 (7th Cir. 2014) ("Unless and until a district

---

[16] **[CLASSIFIED MATERIAL REDACTED]**

judge performs his or her statutory duty of attempting to determine the legality of the surveillance without revealing any of the fruits of the surveillance to defense counsel, there is no basis for concluding that disclosure is necessary in order to avert an erroneous conviction."); *United States v. Omar*, 786 F.3d 1104, 1110-11 (8th Cir. 2015) (citing *United States v. Isa*, 923 F.2d 1300, 1306 (8th Cir. 1991)); *United States v. El-Mezain*, 664 F.3d 467, 565 (5th Cir. 2011); *United States v. Hamide*, 914 F.2d 1147, 1149-50 (9th Cir. 1990) (upon review of the FISA materials, the Court determined "that that it is not necessary, to the determination of the legality of the electronic surveillances submitted to the court to disclose those [FISA materials] or any portion thereof to respondents"); *United States v. Ott*, 827 F.2d 473, 476 (9th Cir. 1987).

### 1. The Consistent Use of *In Camera, Ex Parte* Review

Federal courts, including the U.S. Court of Appeals for the D.C. Circuit, have repeatedly and consistently held that FISA "clearly anticipates that an *ex parte*, *in camera* determination is to be the rule. Disclosure and an adversary hearing are the exception, occurring *only* when necessary." *Belfield*, 692 F.2d at 147 (emphasis in original); *accord Omar*, 786 F.3d at 1110 (quoting *Isa*, 923 F.2d at 1306); *Daoud*, 755 F.3d at 481 (finding that "the district judge must, in a non-public ('*in camera*'), nonadversarial ('*ex parte*') proceeding, attempt to determine whether the surveillance was proper"); *see also Duggan*, 743 F.2d at 78;[17] *El-Mezain*, 664 F.3d at 567 ("[D]isclosure of FISA materials is the exception and *ex parte*, *in camera* determination is the rule.") (citing *Abu-Jihaad*, 630 F.3d at 129); *Rosen*, 447 F. Supp. 2d at 546.

Every court that has addressed a motion to disclose FISA materials or to suppress FISA information has been able to reach a determination as to the legality of the FISA collection at issue based on

---

[17] In *Duggan*, the Second Circuit explained that disclosure might be necessary "if the judge's initial review revealed potential irregularities such as 'possible misrepresentations of fact, vague identification of persons to be surveilled or surveillance records which include[] a significant amount of nonforeign intelligence information, calling into question compliance with the minimization standards contained in the order.'" 743 F.2d at 78 (quoting S. Rep. 95-604, pt. 1, at 58 1978 U.S.C.C.A.N., at 3960).

its *in camera, ex parte* review, and the Government has never been required to disclose FISA information

or materials in order for a court to do so.[18] *See, e.g., United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009);

*Abu-Jihaad*, 531 F. Supp. 2d at 310, *aff'd*, 630 F.3d at 129-30; *Omar*, 786 F.3d at 1110-11; *El-Mezain*, 664

F.3d at 566 (quoting district court's statement that no court has ever held an adversarial hearing to assist

the court); *In re Grand Jury Proceedings of the Special Apr. 2002 Grand Jury ("In re Grand Jury Proceedings")*, 347

F.3d 197, 203 (7th Cir. 2003) (noting that no court has ever ordered disclosure of FISA materials); *Isa*,

923 F.2d at 1306 (explaining that "study of the materials leaves no doubt that substantial national secu-

rity interests required the *in camera, ex parte* review, and that the district court properly conducted such a

review"); *United States v. Badia*, 827 F.2d 1458, 1463 (11th Cir. 1987); *Rosen*, 447 F. Supp. 2d at 546; *United*

*States v. Sattar*, No. 02-CR-395, 2003 WL 22137012, at *6 (S.D.N.Y. Sept. 15, 2003) (citing *United States*

*v. Nicholson*, 955 F. Supp. 588, 592 & n.11 (E.D. Va. Feb. 14, 1997) (noting "this court knows of no

instance in which a court has required an adversary hearing or disclosure in determining the legality of

a FISA surveillance"); *United States v. Thomson*, 752 F. Supp. 75, 79 (W.D.N.Y. Oct. 24, 1990).

The rationale for non-disclosure is clear: "In the sensitive area of foreign intelligence gathering,

the need for extreme caution and sometimes even secrecy may not be overemphasized." *Ott*, 827 F.2d

at 477 ("Congress has a legitimate interest in authorizing the Attorney General to invoke procedures

designed to ensure that sensitive security information is not unnecessarily disseminated to *anyone* not

involved in the surveillance operation in question.") (emphasis in original); *accord Isa*, 923 F.2d at 1306

(The Court's "study of the materials leaves no doubt that substantial national security interests required

the *in camera, ex parte* review, and that the district court properly conducted such a review."); *United States*

---

[18] The district court in *United States v. Daoud*, No. 12-CR-723, 2014 WL 321384 (N.D. Ill. Jan. 29, 2014), ruled that it was capable of making the determination, but nevertheless ordered the disclosure of FISA materials. The Government appealed the district court's order to the U.S. Court of Appeals for the Seventh Circuit, which overturned the district court's decision to disclose, stating, "So clear is it that the materials were properly withheld from defense counsel that there is no need for a remand to enable the district judge to come to the same conclusion, because she would have to do so." *Daoud*, 755 F.3d at 485.

*v. Medunjanin*, No. 10-CR-19-1, 2012 WL 526428, at *9 (E.D.N.Y. Feb. 16, 2012) (finding persuasive the Government's argument that "unsealing the FISA materials in this case would provide the defense with unnecessary details of an extraordinarily sensitive anti-terrorism investigation"); *United States v. Islamic Am. Relief Agency ("IARA")*, No. 07-00087-CR-W-NKL, 2009 WL 5169536, at *3-4 (W.D. Mo. Dec. 21, 2009).

Confidentiality is critical to national security. "If potentially valuable intelligence sources" believe that the United States "will be unable to maintain the confidentiality of its relationship to them, many [of those sources] could well refuse to supply information." *CIA v. Sims*, 471 U.S. 159, 175 (1985); *see also Phillippi v. CIA*, 655 F.2d 1325, 1332-33 (D.C. Cir. 1981). When considering whether the disclosure of classified sources, methods, techniques, or information would harm the national security, federal courts have expressed a great reluctance to replace the considered judgment of executive branch officials charged with the responsibility of weighing a variety of subtle and complex factors in determining whether the disclosure of information may lead to an unacceptable risk of compromising the intelligence gathering process, and determining whether foreign agents, spies, and terrorists are capable of piecing together a mosaic of information that, when revealed, could reasonably be expected to harm the national security of the United States. *See Sims*, 471 U.S. at 180; *United States v. Yunis*, 867 F.2d 617, 623 (D.C. Cir. 1989) ("Things that did not make sense to the District Judge would make all too much sense to a foreign counter-intelligence specialist who could learn much about this nation's intelligence-gathering capabilities from what these documents revealed about sources and methods."); *Halperin v. CIA*, 629 F.2d 144, 150 (D.C. Cir. 1980) ("[E]ach individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself."). Adversary hearings would create the potential dangers that courts have consistently sought to avoid.

As the D.C. Circuit in *Belfield* explained:

> Congress recognized the need for the Executive to engage in and employ the fruits of clandestine surveillance without being constantly hamstrung by disclosure requirements.

> The statute is meant to 'reconcile national intelligence and counterintelligence needs with constitutional principles in a way that is consistent with both national security and individual rights.' In FISA the privacy rights of individuals are ensured not through mandatory disclosure, but through its provisions for in-depth oversight of FISA surveillance by all three branches of government and by a statutory scheme that to a large degree centers on an expanded conception of minimization that differs from that which governs law enforcement surveillance.

692 F.2d at 148 (footnotes and citations omitted); *see also Stewart*, 590 F.3d at 128 ("FISA applications are likely to contain allegedly sensitive information relating to perceived issues of national security.... For this reason, *ex parte*, *in camera* determination is to be the rule.") (quoting *Duggan*, 743 F.2d at 77); *Daoud*, 755 F.3d at 483 ("Everyone recognizes that privacy is a legally protectable interest, and it is not an interest of private individuals alone. [FISA] is an attempt to strike a balance between the interest in full openness of legal proceedings and the interest in national security, which requires a degree of secrecy concerning the government's efforts to protect the nation."); *ACLU Found. of So. Cal. v. Barr*, 952 F.2d 457, 465 (D.C. Cir. 1991) (citing *Belfield* for the proposition that 50 U.S.C. § 1806(f) "is an acceptable means of adjudicating the constitutional rights of persons who have been subjected to FISA surveillance").

### 2. The Constitutionality of *In Camera, Ex Parte* Review

The constitutionality of FISA's *in camera, ex parte* review provisions has been affirmed by every federal court that has considered the matter, including the D.C. Circuit. *See, e.g., Belfield*, 692 F.2d at 148-49; *Stewart*, F.3d 590 at 126 (The Second Circuit has concluded that "the procedures fashioned in FISA [are] a constitutionally adequate balancing of the individual's Fourth Amendment rights against the nation's need to obtain foreign intelligence information.") (quoting *Duggan*, 743 F. 2d at 73); *Abu-Jihaad*, 630 F.3d at 117; *El-Mezain*, 664 F.3d at 567; *Ott*, 827 F.2d at 476-77 (FISA's review procedures do not deprive a defendant of due process); *United States v. Damrah*, 412 F.3d 618, 624 (6th Cir. 2005) ("FISA's requirement that the district court conduct an *ex parte*, *in camera* review of FISA materials does not deprive a defendant of due process."); *ACLU Found. of So. Cal.*, 952 F.2d at 465; *Isa*, 923 F.2d at 1306 (upholding the district court's *in camera, ex parte* review as constitutional and stating that the process

delineated under FISA "provides even more protection" than defendants receive in other contexts); *United States v. Benkahla*, 437 F. Supp. 2d 541, 554 (E.D. Va. May 17, 2006); *United States v. Megahey*, 553 F. Supp. 1180, 1194 (E.D.N.Y. Dec. 1, 1982) ("[E]x *parte, in camera* procedures provided in 50 U.S.C. § 1806(f) are constitutionally sufficient to determine the lawfulness of the electronic surveillance at issue while safeguarding defendant's fourth amendment rights."); *United States v. Falvey*, 540 F. Supp. 1306, 1315-16 (E.D.N.Y. June 15, 1982) (A "massive body of pre-FISA case law of the Supreme Court, [the Second] Circuit and others" supports the conclusion that the legality of electronic surveillance should be determined on an *in camera, ex parte* basis.).

In summary, once an aggrieved person is given notice that the Government intends to use FISA information against it in a covered proceeding and the 1806(f) procedures are invoked, FISA mandates a process by which district courts must conduct an initial *in camera, ex parte* review of FISA applications, orders, and related materials in order to determine whether FISA information was lawfully authorized and conducted. Such *in camera, ex parte* review is the rule in such cases, and that procedure is constitutional.

## B. THE DISTRICT COURT'S SUBSTANTIVE REVIEW

In evaluating the legality of the FISA collection, the district court's review should determine: (1) whether the application established the probable cause showings required by FISA; (2) whether the certification submitted by the Executive Branch in support of a FISA application was properly made; and (3) whether the collection was properly minimized. *See Abu-Jihaad*, 630 F.3d at 130-31; *see also* 50 U.S.C. § 1806(f).

### 1. Standard of Review of Probable Cause

Although federal courts are not in agreement as to whether the FISC's probable cause determination should be reviewed *de novo* or afforded due deference, the material here satisfies either standard of review. *See Omar*, 786 F.3d at 1112 ("[W]e have no hesitation in concluding that probable cause under

FISA existed under any standard of review."); *see also Abu-Jihaad*, 630 F.3d at 130 ("Although the established standard of judicial review applicable to FISA warrants is deferential, the government's detailed and complete submissions in this case would easily allow it to clear a higher standard of review."). The D.C. Circuit has not addressed this issue. A number of courts, citing the *ex parte* nature of the proceedings, have reviewed the FISC's probable cause determination *de novo*.[19] But it is appropriate to accord due deference to the findings of the FISC, an approach adopted by some courts that have reviewed this question. *See Abu-Jihaad*, 630 F.3d at 130; *accord United States v. Ahmed*, No. 1:06-CR-147, 2009 U.S. Dist. Lexis 120007 at *21-22 (N.D. Ga. Mar. 19, 2009) (FISC's "determination of probable cause should be given 'great deference' by the reviewing court") (citing *Illinois v. Gates*, 462 U.S. 231, 236 (1983)).

**[CLASSIFIED MATERIAL REDACTED]**

### 2. Probable Cause Standard

For electronic surveillance and physical search conducted within the United States, FISA requires a finding of probable cause that the target "is a foreign power or an agent of a foreign power" and that each facility or place "at which the electronic surveillance is directed is being used, or is about to be used by," or that the property or premises to be searched "is or is about to be owned, used, possessed by, or is in transit to or from," a foreign power or an agent of a foreign power. 50 U.S.C. §§ 1805(a), 1824(a); *Abu-Jihaad*, 630 F.3d at 130. It is this standard—not the standard applicable to criminal search warrants—that this Court must apply. *See Abu-Jihaad*, 630 F.3d at 130-31; *United States v. Turner*, 840 F.3d 336, 340-41 (2016) (applying the FISA standard of probable cause); *Omar*, 786 F.3d

---

[19] Federal courts in other circuits have determined that the probable cause determination of the FISC should be reviewed *de novo*. *See, e.g., United States v. Huang*, 15 F. Supp. 3d 1131, 1138 (D. N.M. 2014) (noting no precedent in Tenth Circuit applying *de novo* review); *United States v. Warsame*, 547 F. Supp. 2d 982, 991 (D. Minn. 2008) (the required showing is "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit ..., there is a fair probability" that the search will be fruitful (citing *Illinois v. Gates*, 462 U.S. 231, 238 (1983)); *United States v. Hammoud*, 381 F.3d 316, 332 (4th Cir. 2004), *rev'd on other grounds*, 543 U.S. 1097 (2005), *op. reinstated in pertinent part*, 405 F.3d 1034 (4th Cir. 2005) (applied *de novo* review); *Rosen*, 447 F. Supp. 2d at 545 (same); *Kashmiri*, 2010 WL 4705159, at *1 (same). In each of these cases, the courts applied a *de novo* standard in reviewing the FISC's probable cause findings, and each court found the applications before it contained probable cause.

at 1111 ("[R]ather than focusing on probable cause to believe that a person has committed a crime, the FISA standard focuses on the status of the target as a foreign power or an agent of a foreign power.") (quoting *El-Mezain*, 664 F.3d at 564); *United States v. Duka*, 671 F.3d 329, 338 (3d Cir. 2011); *United States v. Cavanagh*, 807 F.2d 787, 790 (9th Cir. 1987) (citing *United States v. United States District Court (Keith)*, 407 U.S. 297, 322 (1972)).

The probable cause threshold which the Government must satisfy before receiving authorization to conduct electronic surveillance under FISA complies with the Fourth Amendment's reasonableness standard.  The argument that FISA's different probable cause standard violates the Fourth Amendment's reasonableness requirement has been uniformly rejected by federal courts.  *See, e.g., Abu-Jihaad*, 630 F.3d at 120 (listing sixteen cases that have ruled FISA, including the statutory probable cause standard, does not violate the Fourth Amendment).

The Supreme Court has stated that "[d]ifferent standards may be compatible with the Fourth Amendment if they are reasonable both in relation to the legitimate need of the Government for intelligence information and the protected rights of our citizens." *Keith*, 407 U.S. at 322-23 (recognizing that domestic security surveillance "may involve different policy and practical considerations than the surveillance of 'ordinary crime'").  In *Keith*, the Supreme Court acknowledged that:  (1) the "focus of ... surveillance [in domestic security investigations] may be less precise than that directed against more conventional types of crime;" (2) unlike ordinary criminal investigations, "[t]he gathering of security intelligence is often long range and involves the interrelation of various sources and types of information;" and (3) the "exact targets of such surveillance may be more difficult to identify" than in surveillance operations of ordinary crimes under Title III. *Id.* Although *Keith* was decided before FISA's enactment and addressed purely domestic security surveillance, the rationale underlying *Keith* applies *a fortiori* to foreign intelligence surveillance, where the Government's interest, at least from a national security perspective, would typically be more pronounced.

21

FISA was enacted partly in response to *Keith*. In constructing FISA's framework, Congress addressed *Keith*'s question of whether departures from traditional Fourth Amendment procedures "are reasonable, both in relation to the legitimate need of Government for intelligence information and the protected rights of our citizens" and "concluded that such departures are reasonable." *See* S. Rep. No. 95-701, 95th Cong., 2d Sess., at 11-12 (1978), *reprinted in* 1978 U.S.C.C.A.N. 3973, 3980. Similarly, many courts—including the FISC of Review—have relied on *Keith* in holding that FISA collection conducted pursuant to a FISC order is reasonable under the Fourth Amendment. *See Duggan*, 743 F.2d at 74 (holding that FISA does not violate the Fourth Amendment); *United States v. Ning Wen*, 477 F.3d 896, 898 (7th Cir. 2007) (holding that FISA is constitutional despite using "a definition of 'probable cause' that does not depend on whether a domestic crime has been committed"); *Damrah*, 412 F.3d at 625 (denying the defendant's claim that FISA's procedures violate the Fourth Amendment); *In re Sealed Case*, 310 F.3d 717, 738, 746 (FISA Ct. Rev. 2002) (finding that while many of FISA's requirements differ from those in Title III, few of those differences have constitutional relevance); *United States v. Pelton*, 835 F.2d 1067, 1075 (4th Cir. 1987) (finding FISA's procedures compatible with the Fourth Amendment); *Cavanagh*, 807 F.2d at 790-91 (holding that FISA satisfies the Fourth Amendment requirements of probable cause and particularity); *Warsame*, 547 F. Supp. 2d 982, 993-94 (D. Minn 2008); *United States v. Mubayyid*, 521 F. Supp. 2d 125, 135-41 (D. Mass. Nov. 5, 2007) (rejecting claim that FISA violates the Fourth Amendment's judicial review, probable cause, notice, and particularity requirements); *United States v. Marzook*, 435 F. Supp. 2d 778, 786 (N.D. Ill. June 22, 2006) ("Courts uniformly have held that FISA procedures satisfy the Fourth Amendment's reasonableness requirement"); *Falvey*, 540 F. Supp. at 1311-14 (finding that FISA procedures satisfy the Fourth Amendment's warrant requirement).

### 3. Standard of Review of Certifications

Certifications submitted in support of a FISA application are "subjected only to minimal scrutiny by the courts," *Badia*, 827 F.2d at 1463, and are "presumed valid," *Duggan*, 743 F.2d at 77 & n.6 (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)); *see also Turner*, 840 F.3d at 342; *United States v. Campa*, 529

Case 1:20-mc-00116-DLF   Document 9   Filed 12/15/20   Page 31 of 41

F.3d 980, 993 (11th Cir. 2008); *Rosen*, 447 F. Supp. 2d at 545; *Warsame*, 547 F. Supp. 2d at 990 ("[A] presumption of validity [is] accorded to the certifications."). When a FISA application is presented to the FISC, "[t]he FISA Judge, in reviewing the application, is not to second-guess the executive branch official's certification that the objective of the surveillance is foreign intelligence information." *Duggan*, 743 F.2d at 77. Likewise, Congress intended that the reviewing district court should "have no greater authority to second-guess the executive branch's certifications than has the FISA judge." *Id.*; *see also In re Grand Jury Proceedings*, 347 F.3d at 204-05; *Badia*, 827 F.2d at 1463; *Rahman*, 861 F. Supp. at 250.

The district court's review should determine whether the certifications were made in accordance with FISA's requirements. *See United States v. Omar*, No. 09-242, 2012 WL 2357734, at *3 (D. Minn. June 20, 2012) ("[T]he reviewing court must presume as valid 'the representations and certifications submitted in support of an application for FISA surveillance' ... absent a showing sufficient to trigger a *Franks* hearing") (citation omitted), *aff'd*, 786 F.3d 1104; *see also Campa*, 529 F.3d at 993 ("[I]n the absence of a *prima facie* showing of a fraudulent statement by the certifying officer, procedural regularity is the only determination to be made if a non-United States person is the target."); *United States v. Alwan*, No. 1:11-CR-13, 2012 WL 399154, at *7 (W.D. Ky. Feb. 7, 2012) ("The [c]ourt is not to second-guess whether the certifications were correct, but merely to ensure they were properly made.") (quoting *United States v. Ahmed*, No. 1:06-CR-147, 2009 U.S. Dist. LEXIS 120007, at *20 (N.D. Ga. Mar. 19, 2009)). Under FISA, "the FISA Judge need only determine that the application contains all of the statements and certifications required by the Act if the target is a non-United States person, whereas he must also find that the certifications are not 'clearly erroneous' if the target is a United States person."[20] *Duggan*, 743 F.2d at 75; *see also Turner*, 840 F.3d at 342; *Campa*, 529 F.3d at 994; *United States v. Kashmiri*, No. 09-CR-830, 2010 WL 4705159, at *2 (N.D. Ill. Nov. 10, 2010). A "clearly erroneous" finding is established only when "although there is evidence to support it, the reviewing court on the [basis of the] entire

---

[20] **[CLASSIFIED MATERIAL REDACTED]**

evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948); *United States v. Garcia*, 413 F.3d 201, 222 (2d Cir. 2005); *LARA*, 2009 WL 5169536, at *4 (identifying "clearly erroneous" standard of review for FISA certifications).

### 4. The Good Faith Exception

The "good faith" exception to the exclusionary rule articulated in *United States v. Leon*, 468 U.S. 897 (1984), applies to FISA surveillance. *See, e.g., United States v. Hasan*, No. W-12MC195, 2012 WL 12883086, at *4 (W.D. Tex. Aug. 14, 2012), *aff'd,* 535 F. App'x 378 (5th Cir. 2013). Accordingly, a court's determination that a particular FISC order was not supported by probable cause, or that one or more of the FISA certification requirements were not in fact met, would not affect the admissibility of the evidence obtained or derived from the FISA-authorized electronic surveillance as it would be admissible under the "good faith" exception to the exclusionary rule. *Id.* For example, numerous courts have stated that the good faith exception applies to FISA evidence. *See Ning Wen*, 477 F.3d at 897 (noting that federal officers were entitled to rely in good faith on a FISA warrant); *Ahmed*, 2009 U.S. Dist. LEXIS 120007, at *25 n.8, 26-27 ("The FISA evidence obtained ... would be admissible under *Leon*'s 'good faith' exception to the exclusionary rule were it not otherwise admissible under a valid warrant."); *Mubayyid*, 521 F. Supp. 2d at 140 n.12 ("[T]here appears to be no issue as to whether the government proceeded in good faith and in reasonable reliance on the FISA orders."); *Marzook*, 435 F. Supp. at 790-91 (holding, in an analogous context, that "the FBI's reliance on the Attorney General's approval under Executive Order No. 12333—an order that no court has found unconstitutional—was [] objectively reasonable because that order pertains to foreign intelligence gathering.").

In *Illinois v. Krull*, the Supreme Court "ruled categorically that 'suppressing evidence obtained by an officer acting in objectively reasonable reliance on a statute' would not further the purposes of the exclusionary rule, even if that statute is later declared unconstitutional." *Duka*, 671 F.3d at 346-37 (quoting *Krull*, 480 U.S. 340, 349-50 (1987)). The exclusionary rule should not be imposed to punish an

officer who acts in objectively reasonable reliance on a duly enacted statute. "Because the rule 'is designed to deter police misconduct,' it applies only where it will 'alter the behavior of individual law enforcement officers or the policies of their departments.'" *Duka*, 671 F.3d at 346 (quoting *Leon*, 468 U.S. at 916-18). The exclusionary rule should not be applied when it would serve no such deterrent purpose. *See Davis v. United States*, 564 U.S. 229, 237 (2011); *United States v. Bin Laden*, 126 F. Supp. 2d 264, 282-84 (S.D.N.Y. 2000).

## DISCUSSION

I. [CLASSIFIED MATERIAL REDACTED]

[CLASSIFIED MATERIAL REDACTED]

A. THE FISA APPLICATIONS MET FISA'S PROBABLE CAUSE STANDARD.

[CLASSIFIED MATERIAL REDACTED]

1.    [CLASSIFIED MATERIAL REDACTED]

[CLASSIFIED MATERIAL REDACTED]

a. [CLASSIFIED MATERIAL REDACTED]

[CLASSIFIED MATERIAL REDACTED]

b. [CLASSIFIED MATERIAL REDACTED]

[CLASSIFIED MATERIAL REDACTED]

i.    [CLASSIFIED MATERIAL REDACTED]

[CLASSIFIED MATERIAL REDACTED]

ii. [CLASSIFIED MATERIAL REDACTED]

[CLASSIFIED MATERIAL REDACTED]

2.    [CLASSIFIED MATERIAL REDACTED]

[CLASSIFIED MATERIAL REDACTED]

3.    [CLASSIFIED MATERIAL REDACTED]

[CLASSIFIED MATERIAL REDACTED]

4.   [CLASSIFIED MATERIAL REDACTED]

[CLASSIFIED MATERIAL REDACTED]

## B. THE CERTIFICATIONS COMPLIED WITH FISA.

[CLASSIFIED MATERIAL REDACTED]

### 1. The Requisite Official Certified that the Information Sought Was Foreign Intelligence Information.

[CLASSIFIED MATERIAL REDACTED]

### 2. The Requisite Official Certified that "A Significant Purpose" of the Surveillance Was to Obtain Foreign Intelligence Information.

[CLASSIFIED MATERIAL REDACTED]

### 3. The Requisite Official Certified that the Information Could Not Be Reasonably Obtained Through Normal Investigative Techniques.

[CLASSIFIED MATERIAL REDACTED]

## C. THE ELECTRONIC SURVEILLANCE WAS LAWFULLY CONDUCTED.

This Court's *in camera*, *ex parte* review of the FISA materials will demonstrate that the electronic surveillance was lawfully conducted, *i.e.*, that it was conducted in conformity with an order of authorization or approval. The FISA-obtained or -derived information that will be used against CTAC in administrative proceedings before the FCC was acquired, retained, and disseminated by the FBI in accordance with FISA's minimization requirements, the SMPs adopted by the Attorney General, and with approval by the FISC.

### 1. The Government Complied with the Standard Minimization Procedures.

Once a reviewing court is satisfied that the electronic surveillance was properly certified and the information was lawfully acquired pursuant to FISA, it must then examine whether the electronic surveillance was lawfully conducted. *See* 50 U.S.C. § 1806(f). To do so, the reviewing court must determine whether the Government followed the relevant minimization procedures to appropriately minimize the information acquired pursuant to FISA.

[CLASSIFIED MATERIAL REDACTED]

26

FISA's legislative history and the applicable case law demonstrate that the definitions of "minimization procedures" and "foreign intelligence information" were intended to take into account the realities of collecting foreign intelligence because the activities of persons engaged in clandestine intelligence gathering or international terrorism are often not obvious on their face. *See Rahman*, 861 F. Supp. at 252-53. The degree to which information is required to be minimized varies somewhat given the specifics of a particular investigation, such that less minimization at acquisition is justified when "the investigation is focusing on what is thought to be a widespread conspiracy" and more extensive surveillance is necessary "to determine the precise scope of the enterprise." *In re Sealed Case*, 310 F.3d at 741 (citation omitted); *see also United States v. Bin Laden*, 126 F. Supp. 2d 264, 286 (S.D.N.Y. Dec. 5, 2000) ("[M]ore extensive monitoring and greater leeway in minimization efforts are permitted in a case like this given the world-wide, covert and diffuse nature of the international terrorist group(s) targeted." (internal quotation marks and citation omitted)). Furthermore, the activities of foreign powers and their agents are often not obvious from an initial or cursory overhear of conversations. To the contrary, agents of foreign powers frequently engage in coded communications, compartmentalized operations, the use of false identities and other practices designed to conceal the breadth and aim of their operations, organization, activities and plans. *See, e.g., United States v. Salameh*, 152 F.3d 88, 154 (2d Cir. 1998) (noting that two conspirators involved in the 1993 bombing of the World Trade Center in New York referred to the bomb plot as the "study" and to terrorist materials as "university papers"). As one court explained, "[i]nnocuous-sounding conversations may in fact be signals of important activity; information on its face innocent when analyzed or considered with other information may become critical." *Kevork*, 634 F. Supp. 1002, 1017 (C.D. 1985) (quoting H.R. Rep. No. 95-1283, 95th Cong., 2d Sess., pt. 1, at 55 (1978)); *see also Hammoud*, 381 F.3d 381 F.3d 316, 332, 334 (4th Cir. 2004), (citing *Salameh*, 152 F.3d at 154); *In re Sealed Case*, 310 F.3d at 740-41; *Thomson*, 752 F. Supp. at 81 (noting that it is permissible to retain and disseminate "bits and pieces" of information until the information's "full significance be-

comes apparent") (citing H.R. Rep. No. 95-1283, pt. 1, at 58); *Bin Laden*, 126 F. Supp. 2d at 286.  Like-

wise, "individual items of information, not apparently significant when taken in isolation, may become

highly significant when considered together over time." *Rahman*, 861 F. Supp. at 252-53 (citing H.R.

Rep. No. 95-1283, pt. 1, at 55, 59).  The Government must be given flexibility where the conversations

are carried out in a foreign language. *Mubayyid*, 521 F. Supp. 2d at 134; *Rahman*, 861 F. Supp. at 252.  As

a result, "courts have construed 'foreign intelligence information' broadly and sensibly allowed the gov-

ernment some latitude in its determination of what is foreign intelligence information." *Rosen*, 447 F.

Supp. 2d at 551.

> The nature of the foreign intelligence information sought also impacts implementation of the

minimization procedures at the retention and dissemination stages.  There is a legitimate need to conduct

a thorough post-acquisition review of FISA information that involves a United States person who is

acting as an agent of a foreign power.  As Congress explained:

> > It is "necessary" to identify anyone working with him in this network, feeding him in-
> > formation, or to whom he reports. Therefore, it is necessary to acquire, retain and dis-
> > seminate information concerning all his contacts and acquaintances and his movements.
> > Among his contacts and acquaintances, however, there are likely to be a large number
> > of innocent persons. Yet, information concerning these persons must be retained at least
> > until it is determined that they are not involved in the clandestine intelligence activities
> > and may have to be disseminated in order to determine their innocence.

H.R. Rep. No. 95-1283, pt. 1, at 58.  Indeed, at least one court has cautioned that, when a U.S. person

communicates with an agent of a foreign power, the Government would be "remiss in meeting its for-

eign counterintelligence responsibilities" if it did not thoroughly "investigate such contacts and gather

information to determine the nature of those activities." *Thomson*, 752 F. Supp. at 82.

> Congress also recognized that agents of a foreign power are often very sophisticated and skilled

at hiding their activities.  *Cf. id.* at 81 (quoting H.R. Rep. No. 95-1283, pt. 1, at 58).  Accordingly, to

pursue leads, Congress intended that the Government be given "a significant degree of latitude" with

respect to the "retention of information and the dissemination of information between and among

counterintelligence components of the Government." *Cf. id.* (quoting H.R. Rep. No. 95-1283, pt. 1, at 59).

In light of these realities, Congress recognized that "no electronic surveillance can be so conducted that innocent conversations can be totally eliminated." *See* S. Rep. No. 95-701, at 39, 1978 U.S.C.C.A.N., at 4008 (quoting *United States v. Bynum*, 485 F.2d 490, 500 (2d Cir. 1973)). The Fourth Circuit reached the same conclusion in *Hammoud*, stating that the "mere fact that innocent conversations were recorded, without more, does not establish that the government failed to appropriately minimize surveillance." 381 F.3d at 334.

Accordingly, in reviewing the adequacy of minimization efforts, the test to be applied is neither whether innocent conversations were intercepted, nor whether mistakes were made with respect to particular communications. Rather, as the United States Supreme Court stated in the context of Title III surveillance, there should be an "objective assessment of the [agents'] actions in light of the facts and circumstances confronting [them] at the time." *Scott v. United States*, 436 U.S. 128, 136 (1978). "[T]he test of compliance is 'whether a good-faith effort to minimize was attempted.'" *Mubayyid*, 521 F. Supp. 2d at 135 (citation omitted); *see also Hammoud*, 381 F.3d at 334 ("The minimization requirement obligates the Government to make a good faith effort to minimize the acquisition and retention of irrelevant information."); S. Rep. No. 95-701, at 39-40, 1978 U.S.C.C.A.N., at 4008-09 (stating that the court's role is to determine whether "'on the whole, the agents have shown a high regard for the right of privacy and have done all they reasonably could do to avoid unnecessary intrusion'" (citation omitted)); *IARA*, 2009 WL 5169536, at *6 (quoting S. Rep. No. 95-701, at 39-40, 1978 U.S.C.C.A.N., at 3990-91).

Moreover, as noted above, FISA expressly states that the Government is not required to minimize information that is "evidence of a crime," whether or not it is also foreign intelligence information. 50 U.S.C. §§ 1801(h)(3), 1821(4)(c); *see also Isa*, 923 F.2d at 1304 (noting that "[t]here is no requirement that the 'crime' be related to foreign intelligence"). As a result, to the extent that certain communications

of a United States person may be evidence of a crime or otherwise may establish an element of a substantive or conspiratorial offense, such communications need not be minimized. *See Isa*, 923 F.2d at 1305.

Even if certain communications were not properly minimized, suppression would not be the appropriate remedy with respect to those communications that met the standard. As discussed above, absent evidence that "on the whole" there has been a "complete" disregard for the minimization procedures, the fact that some communications should have been minimized does not affect the admissibility of others that were properly acquired and retained. Indeed, Congress specifically intended that the only evidence that should be suppressed is the "evidence which was obtained unlawfully." H.R. Rep. No. 95-1283, pt. 1, at 93. FISA's legislative history reflects that Congress intended only a limited sanction for errors of minimization:

> As the language of the bill makes clear, only that evidence which was obtained unlawfully or derived from information obtained unlawfully would be suppressed. If, for example, some information should have been minimized but was not, only that information should be suppressed; the other information obtained lawfully should not be suppressed.

*Id.*; *see also United States v. Falcone*, 364 F. Supp. 877, 886-87 (D.N.J. Sept. 28, 1973), *aff'd*, 500 F.2d 1401 (3d Cir. 1974) (Title III); *accord Medunjanin*, 2012 WL 526428, at *12 (disclosure and suppression not warranted where "failure to adhere to [the minimization] protocol was *de minimis*").

### 2. The FISA Information Was Appropriately Minimized.

**[CLASSIFIED MATERIAL REDACTED]**

Based upon this information, we respectfully submit that the Government lawfully conducted the FISA collection discussed herein. Consequently, for the reasons stated above, the Court should find that the FISA collection discussed herein was lawfully conducted under the minimization procedures approved by the FISC and applicable to the FISA collection discussed herein.

## II.  THE FISA SURVEILLANCE AT ISSUE WAS CONDUCTED IN GOOD FAITH.

**[CLASSIFIED MATERIAL REDACTED]**

### III.  THERE IS NO BASIS FOR THE COURT TO DISCLOSE FISA MATERIALS.

The Government has never been required to disclose FISA information or materials to an aggrieved person under § 1806(f), and there is no reason for the Court to order disclosure here.  The Attorney General has determined and averred that disclosure or an adversary hearing with respect to the FISA material at issue would harm U.S. national security.  *See* Sealed Ex. 1.  Disclosure is neither "necessary" for the Court to determine that the FISA surveillance at issue was lawfully authorized and conducted, 50 U.S.C. § 1806(f), nor "require[d]" by due process, *id.* § 1806(g).

There is nothing extraordinary about the instant FISA-authorized electronic surveillance that would justify the disclosure of highly sensitive and classified FISA material.[21]  The FISA materials are well-organized, easily reviewable, and fully and facially sufficient to allow the Court to correctly conclude that the electronic surveillance at issue was lawfully authorized and conducted.  Where that is the case, disclosure to CTAC is not "necessary," *id.* § 1806(f), and the Court is not authorized to disclose the sensitive FISA information and materials requested by CTAC, *see Belfield*, 692 F.2d at 147 ("Disclosure and an adversary hearing are the exception, occurring *only* when necessary."); *Abu-Jihaad*, 630 F.3d at 129; *Duggan*, 743 F.2d at 78 (upholding district court's refusal to disclose FISA materials where it determined that disclosure "was not necessary for an accurate determination of the legality of the surveillance" at issue); *United States v. Hasbajrami*, No. 11-CR-623 (JG), 2016 WL 1029500, at *14 (E.D.N.Y. Feb. 18, 2016) (concluding that "disclosure of the [FISA] materials to the defendant [wa]s unnecessary" where the court's review of them was "relatively straightforward and not complex"); *Rosen*, 447 F. Supp. 2d at 546 (explaining that the "exceptional nature of disclosure of FISA material is especially appropriate in light of the possibility that such disclosure might compromise the ability of the United States to gather foreign intelligence information effectively") (citing *Belfield*, 692 F.2d at 147).

---

[21] There is no unclassified FISA material that is not so intertwined with classified material as to make redaction impracticable and any resulting information of no material value.

In its June 3, 2020 request, CTAC stated that it seeks disclosure of the FISA information and materials in the FCC's possession "to determine whether there are grounds to seek suppression of th[]e materials" and so that it "may promptly and fully respond to any subsequent inquiry posed by the Commission, while simultaneously preserving [its] fundamental due process rights." "CTA[C] Response to DoJ Letter Re FISA Materials," at 2 (filed June 3, 2020). But disclosure to an aggrieved party is authorized only if, after the Court's review, it determines that such disclosure is necessary to make an accurate legality determination—not prior to its review to allow an aggrieved party to determine if there is any basis to challenge legality. *See Medunjanin*, 2012 WL 526428, at *10 ("Defense counsel ... may not inspect the FISA dockets to construct a better argument for inspecting the FISA dockets. Such a circular exercise would be patently inconsistent with FISA...."); *Badia*, 827 F.2d at 1464 (rejecting the defendant's request for "disclosure of the FISA application, ostensibly so that he may review it for errors"); *Mubayyid*, 521 F. Supp. 2d at 131. A contrary view would flip FISA's presumption of nondisclosure on its head. Courts have uniformly held that the § 1806(f) procedures—according to which non-disclosure is the rule—satisfy due process. *See supra*. There is thus no basis to disclose the FISA material to CTAC and, indeed, the Attorney General's Declaration has averred that doing so would harm U.S. national security.

## CONCLUSION

Based on the foregoing analysis and the accompanying materials filed herewith, the Government respectfully submits that this Court shall conduct an *in camera*, *ex parte* review of the Government's submissions as required by § 1806(f) and should, pursuant to that review: (1) find that disclosure to CTAC of the FISA materials and the Government's *ex parte* submissions is not necessary to make an accurate determination of the legality of the FISA-authorized electronic surveillance at issue; (2) find that the FISA surveillance at issue was lawfully authorized and conducted; (3) consequently, deny CTAC's requests to the FCC to obtain the FISA information and materials at issue and do so without

an adversary hearing with respect to that material; and (4) order that the FISA materials and the Government's *ex parte* submissions be maintained under seal by the Classified Information Security Officer or his or her designee.[22]


Dated:  December 15, 2020                   Respectfully submitted,

                                            JEFFREY BOSSERT CLARK
                                            Acting Assistant Attorney General

                                            ALEXANDER K. HAAS
                                            Director, Federal Programs Branch

                                            ANTHONY J. COPPOLINO
                                            Deputy Director, Federal Programs Branch

                                            DIANE KELLEHER
                                            Assistant Branch Director, Federal Programs
                                            Branch

                                            */s/ Emily Newton*
                                            EMILY SUE NEWTON (Va. Bar No. 80745)
                                            Senior Trial Counsel
                                            MICHAEL H. BAER (N.Y. 5384300)
                                            Trial Attorney
                                            U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L. Street, NW
                                            Washington, DC 20005
                                            Telephone: (202) 305-8356
                                            Facsimile: (202) 616-8470
                                            Emily.s.newton@usdoj.gov

                                            *Counsel for Petitioner*

---

[22] A district court order granting motions or requests under 50 U.S.C. § 1806(g), a decision that the electronic surveillance was not lawfully authorized or conducted, or an order requiring the disclosure of FISA materials, is a final order for purposes of appeal. 50 U.S.C. § 1806(h). Should the Court conclude that disclosure of any item within any of the FISA materials or any FISA-obtained or -derived information may be required, given the significant national security consequences that would result from such disclosure or suppression, the Government would expect to pursue an appeal. Accordingly, the Government respectfully requests that the Court indicate its intent to do so before issuing any order and that the Court stay any such order pending an appeal by the United States of that order.